**UNITED STATES of America,**
Appellee,

v.

**Lawrence THOMAS and Michael Angelo
Balducci, Appellants.**

**Nos. 365, 370, Dockets 26264, 26124.**

United States Court of Appeals
Second Circuit.

Argued June 14, 1960.

Decided Aug. 26, 1960.

Anthony F. Marra, New York City, for Lawrence Thomas (Theodore Krieger, on the brief).

C. Joseph Hallinan, Jr., New York City, for Michael Angelo Balducci.

James G. Starkey, Asst. U. S. Atty., New York City (S. Hazard Gillespie, Jr., U. S. Atty. for the Southern Dist. of New York, and David R. Hyde, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before WATERMAN, MOORE and HAMLIN, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

Defendants Balducci and Thomas have been convicted by a jury of violating Title 18 U.S.C.A. § 659, Thomas with the theft of goods moving in interstate commerce and Balducci with knowing possession of the stolen goods subsequent to the theft. Upon his appeal Thomas urges as error (1) that effective cross-examination of the government's principal witness against him upon the vital issue of felonious intent was thwarted by the destruction by an F.B.I. agent of rough handwritten notes after they had been used as the basis of a typewritten report; and (2) that, after the jury was reported to be deadlocked, the court gave a prejudicial version of the "Allen" charge, which takes its name from Allen v. United States, 1896, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528. Balducci upon his appeal, contends (1) that the evidence was insufficient to prove his guilt beyond a reasonable doubt; (2) that the indictment should have been dismissed or a mistrial declared upon failure of the F.B.I. agent to produce his original notes; and (3) that the court gave an improper charge as to hostile witness testimony and previous criminal records of witnesses.

*Thomas*

On the night of January 27, 1959, Thomas drove six men [1] in his auto from Manhattan to the Inter-City Carriers Corporation's garage in Yonkers, New York, where two of the group, Demakakos and Cannon, stole a truck and its contents. Thomas, during the trial, claimed that he was unaware of the plan to steal the truck until he heard the six men discussing it enroute to Yonkers. His alleged reason for not turning back was that he was coerced into not doing so by reason of the fact that he had personal knowledge that some of his riders had criminal records.[2] Thomas admitted at the trial that, at no time after he learned of the planned crime was he affirmatively coerced by any threats or physical violence of his fellow travelers. While waiting for the arrival of the to-be stolen truck, he drove the group around the vicinity so that they could familiarize themselves with a get-away route. After the truck was stolen, Thomas, driving the remaining four of his passengers, followed the truck back to New York City. He then proceeded to a rendezvous to meet Demakakos and Cannon and to receive the forty dollars promised for his services. Upon their failure to appear, Thomas and the others drove around looking for the truck. Hours later from a restaurant they saw the truck with Demakakos and Cannon in the cab. Thomas and the others in his car attempted pursuit but failed to overtake the truck. Later when they reappeared at the rendezvous, Demakakos and Cannon told Thomas that he would be paid that evening.

*Balducci*

■ Balducci's role commenced after the truck had been stolen. Cannon and

---

1. James Demakakos, Francis Harold Cannon, Edward Garcia, Angelo Karanasses, George William Sutherland, Raymond F. McCullum.

2. Demakakos (assault and auto theft); Cannon (disorderly conduct); McCullum (assault and battery).

Demakakos, who became Government witnesses, testified in substance as follows: After the truck was stolen and driven into Manhattan, they met Daniel Thomas Bruno at a social club located at 8th Avenue and 28th Street in Manhattan. They reported the theft of the truck to Bruno, who said that they would have to await the arrival of "the other guy." After spending about an hour in a bar, they returned and met Bruno and Balducci. Balducci asked them what was in the truck and they responded that they did not know. Balducci then telephoned an unidentified party, after which he returned and told them that he had to go to Brooklyn with them since the person with the keys to the place where the truck was to be unloaded was not there and that the truck would have to be parked in the street. Balducci with Bruno as a passenger told the others to follow him in the truck and drove his car to Brooklyn from Manhattan, the truck being driven by Cannon and Demakakos. After leaving the truck parked on a street in Brooklyn, Balducci took Demakakos and Cannon back to Manhattan. During the trip back from Brooklyn to Manhattan, Balducci told Demakakos and Cannon that the truck would be unloaded in the morning, that they would be told what was in it and that he would get in touch with Bruno with respect to their payments. On the trial Balducci denied any complicity in the crime and alleged that he merely drove Bruno to Brooklyn as a personal favor to him.

Upon these facts there is no doubt that there was sufficient evidence from which a jury could find that Balducci had dominion and control over the stolen goods from the time he entered upon the scene and took control until the truck was left on the Brooklyn street. As soon as Balducci arrived on the scene and proceeded to issue orders concerning the disposing of the stolen truck and its contents, he effectively assumed control and Demakakos and Cannon became his agents acting under his orders. In United States v. Le Fanti, D.C.D.N.J., 255 F. 210, affirmed 3 Cir., 1919, 259 F. 460, a saloon keeper, who, when express company employees offered to sell him a stolen bale of silk, told them to drive to a dump and throw it off, which they did on signal from him, was held to have had possession of the silk by his agents, justifying conviction of having possession of stolen goods. Furthermore, the conclusion is inescapable that Balducci was participating in, and aiding and abetting, the theft of the truck and the merchandise therein. He not only gave directions but used his own car and acted as the guide to the Brooklyn destination. There is no merit to the Balducci insufficient evidence argument. Balducci had a full opportunity to tell his version of his unwitting and somewhat unwilling participation in the trip to Brooklyn and his lack of any connection with the theft or of any knowledge thereof. The jury heard his disclaimer and obviously rejected it. There was sufficient evidence from which the jury could form their own conclusions as to the truth.

*The Jencks Act (18 U.S.C.A. § 3500) Contention*

Both Balducci and Thomas assert that the testimony of Demakakos against them should be stricken because of the government's failure and inability to produce upon defendants' demand certain notes taken by an F.B.I. agent at the time he interviewed Demakakos. This inability to produce caused, they argue, a frustration of Demakakos' cross-examination to their prejudice. In resolving this question the facts must be critically examined.

On January 28, 1959, Demakakos was taken into custody and questioned by two F.B.I. agents, one of whom took notes, the other did not. On February 3, 1959, from the notes made on two or three pages of 8½ x 11 paper, the agent dictated a report which was transcribed on February 10th. After the typewritten report was received, as a matter of procedure the report was checked against the notes to see whether it accurately reflected the notes and any differences were corrected. Thereafter the agent destroyed the notes.

When called upon to produce the notes, the government stated its inability to do so because of their nonexistence. The report, however, was produced and marked Court's Exhibit 1. The trial court then ordered a preliminary hearing [3] in the absence of the jury to determine whether the report was "a substantially accurate reproduction of the agent's original notes" and stated that if it found that it were, the report would be made available to defendants' counsel for use in cross-examination and the motions to dismiss for failure to produce, denied. The agent thereupon was called and examined and cross-examined at length on the subject. The court upon adequate proof concluded that the report was a substantially accurate reproduction of the notes, denied the motions to dismiss and allowed defendants' counsel to use the report for cross-examination.

Section 3500 of Title 18 United States Code directs the court to order the government to produce "any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." The term "statement" is defined (so far as here applicable) as a transcription "which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

■ In construing Section 3500, significance must be given to the definition of "statement." First, it is said to mean "a written statement made by said witness and signed or otherwise adopted or approved by him." This meaning contemplates a writing which the witness is able to read and, if satisfied as to its accuracy, to adopt or approve by signature or otherwise. The general form of such a statement would most likely be narrative. Next Congress dealt with the more

modern methods of recording ("stenographic, mechanical, electrical, or other recording") which, of course, would provide a verbatim version of the witness' statement. Lastly, was included "a substantially verbatim recital of an oral statement" made by the witness to a government agent "and recorded contemporaneously with the making of such oral statement." Both the words of the statute and the intent behind them combine to lend support to the view that "statement" means a fairly comprehensive reproduction of the witness' words and does not include fragmentary notes, jottings, scraps or writings which are not "substantially verbatim." However, as a practical matter such a construction does not mean that notes of the type here made should be destroyed. Wherever the word "substantially" is used, there will be a need for some judge to determine what is substantial. In this case he might well have held that these notes did not come within the statute. If so, production would not have been required. On the other hand, he might have found enough therein to warrant production. Borderline situations should be resolved by the trial judges and not by government agents. Hence, it would be the better practice to preserve the written notes taken on interviews with persons accused or suspected of crime.

■ The problem for the trial court here was somewhat different. There was no refusal by the government to produce a statement "in the possession of the United States." The notes had been destroyed and with no intent to suppress evidence. There was, however, a report which on the basis of credible evidence accurately reflected Demakakos' story as outlined in the agent's notes. Assurance of accuracy was given and the report delivered to defendants' counsel. Defendants thus had an opportunity to cross-examine Demakakos in the light of the

3. In so doing the court followed the procedure suggested and approved in Palermo v. United States, 1959, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287; United States v. McKeever, 2 Cir., 1959, 271

F.2d 669; United States v. Stromberg, 2 Cir., 1959, 268 F.2d 256, certiorari denied 361 U.S. 863, 80 S.Ct. 123, 4 L. Ed.2d 102.

story he told upon his interview and they thereby received the benefits intended to be bestowed by Section 3500.

Whether the report shown to defendants' counsel was within the terms of Section 3500 is not in issue. The trial judge properly exercised his discretion in favor of the defendants in permitting them to have the report.

 Balducci alleges error in the court's comment after objections were taken to leading questions by government counsel that "I will instruct the jury that they are to take the evidence from the witness' answers, but in weighing his answers they certainly must consider them in the light of the questions." This instruction was not erroneous. Answers cannot be considered without relation to the questions. "Yes" and "No" answers to leading questions may have less evidentiary weight but this is material for jury argument rather than appellate error.

Thomas had had a previous conviction for petit larceny. He was asked, "You have a theft conviction yourself?" Upon this question his counsel erects an argument of guilt by association with other defendants who had been convicted of theft. The trial court carefully and correctly instructed the jury as to the effect of prior convictions upon the value of the testimony of the witnesses and that evidence of earlier crimes might not be taken into consideration in determining the guilt or innocence of any defendant on trial.

Thomas also complains of the trial court's supplemental charge to the jury after it had reported that it was deadlocked. The substance of the charge was that given in Allen v. United States, 1896, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528, now popularly known as the "Allen Charge." This court has recently approved this type of instruction under somewhat similar circumstances in United States v. Curcio and Baker, 2 Cir., 1960, 279 F.2d 681. The language used by the trial judge here was not unlike in substance that approved in United States v. Furlong, 7 Cir., 194 F.2d 1, certiorari denied 1952, 343 U.S. 950, 72 S. Ct. 1042, 96 L.Ed. 1352 and in Kawakita v. United States, 9 Cir., 1951, 190 F.2d 506, affirmed 1952, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249. The charge was not erroneous.

The judgments of conviction are affirmed.