UNITED STATES of America, Appellee,

v.

Charles TOMAIOLO, Defendant-Appellant.

No. 27700.

United States Court of Appeals Second Circuit.

Argued March 18, 1963.

Decided May 21, 1963.

Joseph J. Marcheso, Asst. U. S. Atty., Brooklyn, N. Y. (Joseph P. Hoey, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., on the brief), for appellee.

C. Joseph Hallinan, Jr., New York City for defendant-appellant.

Before LUMBARD, Chief Judge, and CLARK and MARSHALL, Circuit Judges.

LUMBARD, Chief Judge.

The defendant, Charles Tomaiolo, appeals from his fourth conviction before a jury, in the United States District Court for the Eastern District of New York, of criminal acts in connection with a bank robbery which occurred in Brentwood, New York, on November 29, 1955. On this fourth trial, the defendant was found and adjudged guilty of robbing, and conspiring to rob a bank in violation of 18 U.S.C. §§ 2113(a), 371. Other counts of the indictment were disposed of before submission of the case to the jury.

The robbery was committed by two armed men, one of whom, Abraham Nirenberg, was convicted after a separate trial, and his conviction has been affirmed. United States v. Nirenberg, 242 F.2d 632 (2 Cir.), cert. denied, 354 U.S. 941, 77 S.Ct. 1405, 1 L.Ed.2d 1539 (1957). The second of the two men kept most of his face concealed during the robbery, and at each of the four trials the primary evidence identifying the defendant as Nirenberg's associate consisted of testimony of Nirenberg's mistress, Pauline Katz (sometimes known as Pauline Newman). According to her testimony, she assisted Nirenberg and the defendant in their preparations for the robbery, met them at a pre-arranged rendezvous immediately after the robbery, and was present at Nirenberg's home on the day following the robbery when the two men divided the loot. There was other testimony, including descriptions and partial identifications of the defendant by bank employees, corroborating Pauline Katz's account of the robbery. Our opinion reversing the defendant's conviction at the first trial, 249 F.2d 683 (2 Cir., 1957), contains a more

complete account of the evidence, which need not be detailed here. The second trial, which resulted in the defendant's conviction on the conspiracy count and a disagreement among the jury on the substantive counts, was reversed by us because of the government's failure to comply with the requirements of the Jencks Act, 18 U.S.C. § 3500. 286 F.2d 568 (2 Cir., 1961). At the third trial, made necessary by the jury's disagreement at the second, the defendant was convicted of the substantive counts of the indictment, which conviction we reversed for the same failure to comply with the Jencks Act that prompted reversal of the second conviction. 280 F. 2d 411 (2 Cir., 1960).[1]

We think it unfortunate in the extreme that the defendant, first brought to trial in October 1956, has been subjected to this long series of trials. However, as discussed hereafter, we do not think that this conviction should be set aside solely because it was preceded by three other trials on the same charges. And, since we do not find reversible error in the conduct of this trial, the conviction is affirmed.

The defendant objects first to the admission of testimony of Sergeant Keating, a New York State police officer, concerning the physical appearance of the defendant on January 25, 1956, shortly after the robbery was committed. The sum total of Sergeant Keating's testimony was that the defendant was somewhat heavier and somewhat fuller of face in 1956 than he was at the time of the trial; a photograph of the defendant taken by the police was excluded. Presumably this testimony was relevant in connection with the identification of the defendant by employees of the robbed bank. Later on in the trial, the defense called as a witness another state police officer who saw the defendant at the same time as Sergeant Keating and used the officer's testimony in the same connection: to cast doubt on the employees' identifications.

■ The basis of the objection to Sergeant Keating's testimony is that the defendant was unlawfully in custody at the time the observations were made. He had been arrested as a parole violator[2] and brought to the state police barracks at Hawthorne, New York, where Sergeant Keating saw him. The defendant offered to show that the arrest was made without the warrant required by New York Correction Law, McK. Consol.Laws, c. 43, § 216 for the apprehension of parole violators. Accepting this contention as true, we nevertheless think Sergeant Keating's testimony was admissible. At no point did the defense suggest that the defendant had not violated his parole or that the police did not have good reason to believe that he had. (The parole violation was not the crime of which he now stands convicted.) The constitutional rights of the defendant were not infringed, and the mere personal observations of a state official are not inadmissible in a federal court, simply because the defendant's arrest as a parole violator may not have been in accordance with the procedures required by state law. Compare Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963). Nor, assuming the defendant's continued detention to have been unlawful, was the testimony inadmissible under the rule of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), which requires the exclusion of statements obtained from a defendant by federal officials during an unlawful detention. The McNabb rule was adopted by the Supreme Court as an "exercise of its supervisory authority over the administration of criminal justice in the federal courts." 318 U.S. at 341, 63 S.Ct. at 613, 87 L.Ed. 819. It was designed to prevent that easy "glid-

---

1. The third trial was reversed by us before the second because delivery of a transcript of the second trial to assigned counsel for the defendant was delayed. See 280 F.2d at 412.

2. The fact that the defendant had been arrested for a violation of parole, with its implication of a prior criminal record, was kept from the jury.

ing into the evils of 'the third degree,'" which might follow from the too frequent "tempting utilization of intensive interrogation." Mallory v. United States, 354 U.S. 449, 453, 77 S.Ct. 1356, 1358–1359, 1 L.Ed.2d 1479 (1957). See generally Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). Sergeant Keating was a state, not a federal, official; the defendant's arrest was for parole violation and not for interrogation. Accordingly, the McNabb rule and its rationale have no application.

■ A second claim of error is that the trial judge "forced" counsel for the defendant to call Nirenberg as a witness; Nirenberg's testimony on cross-examination, such as his admission of long association with the defendant, was undoubtedly damaging to the defense. On the defendant's motion, the court had ordered Nirenberg to be brought east from Alcatraz where he was serving a sentence on a conviction of the bank robbery for which the defendant was being tried. At one point in the trial, before defense counsel had had an opportunity to examine Nirenberg, the judge mentioned before the jury that Nirenberg was going to be produced in court. Later, in chambers, defense counsel moved for a mistrial on the ground that the judge's casual remark left counsel no choice but to put Nirenberg on the witness stand. The judge overruled the motion, but offered to charge the jury that counsel was not required to put any witness on the stand and that the jury was not to be "concerned" about counsel's failure to do so. The judge then said, still in chambers:

"* * * I don't think there is any harm here because you have asked for Nirenberg, and I think the jury should know I brought him on, whether it is your request or the district attorney's request, because I will charge that it was due to the fact you requested it that Nirenberg was brought here and it was the only way he could get here. That does not mean you would have to use him, and I would charge the jury that

both of you have the right and that it has no effect on it and it is not to be used against him, and I will charge the jury to that effect and I will take that charge." Transcript pp. 527–528.

It is this exchange which, it is asserted, compelled counsel to call Nirenberg as a witness and expose the defendant to the dangers of Nirenberg's cross-examination.

Before Nirenberg gave his testimony, the jury had heard only that Nirenberg would appear; possibly the jury might have inferred from the judge's remark that his appearance had been requested by the defense. Had defense counsel not called Nirenberg, we fail to see how the jury could have drawn unfavorable inferences from this fact. Particularly in view of the offer to charge, we do not think the judge's later remarks in chambers required defense counsel to call Nirenberg. The defense remained free to do as it chose. Had the witness not been called and had the judge improperly commented to the jury on his absence, it would have been time enough to object at that point.

■ The defendant raises issues under the Jencks Act, 18 U.S.C. § 3500. Pauline Katz was interviewed by agents of the F. B. I. prior to the first trial. The agents took notes at the interviews which they later dictated to a stenographer for transcription. The transcriptions were checked against the original notes which were then destroyed. At the trial, the defense called for the production of the transcribed statements and received them. On the government's failure to produce the original notes, long since destroyed, the defense moved that the witness' testimony be stricken. The motion was denied.

We need not consider the entirely hypothetical question whether these notes would have been covered by the Jencks Act had they been available. They were destroyed in good faith (prior to the passage of the Act) and there is no reason to believe that the records turned over to the defense did not accurately and

fully reflect the content of the notes. The failure to produce them did not require that the witness' testimony be stricken. See the dissenting and concurring opinion of Mr. Justice Frankfurter in Campbell v. United States, 365 U.S. 85, 99, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); Campbell v. United States, 296 F.2d 527, 531 (1 Cir., 1961), cert. granted, 371 U.S. 919, 83 S.Ct. 295, 9 L.Ed.2d 229 (1962); United States v. Aviles, 197 F.Supp. 536, 556 (S.D.N.Y.1961).

■ Objection is made to the court's refusal to enforce a subpoena served on an employer of the defendant, requiring the production of records which, according to defense counsel, would have shown that the defendant was at work on the day following the robbery, when Pauline Katz testified that he and Nirenberg had been splitting up the loot. The subpoena was served shortly before the trial was scheduled to end, although, since the records had been produced at the first trial, defense counsel must long have been aware of their existence. The employer advised the court that the records could not be produced for several days, until after the presentation of evidence was to have been concluded. The trial judge declined to enforce the subpoena on the ground that counsel had shown no reason for his delay in requesting the records.

On the next day of the trial, in chambers, the court offered to permit defense counsel to read into evidence a portion of the transcript of the first trial in which an employee of the defendant's employer testified and was cross-examined about the records, then present in court, which the defense wanted produced. Without offering any explanation, defense counsel refused this offer, saying only, "I don't choose to try my case in that manner." Transcript p. 997.

The probable explanation of counsel's refusal is not hard to find. The testimony at the first trial showed that the defendant had worked only in the afternoon of the day in question (the day following the robbery) and had not worked at all on the day of the robbery. The testimony and, presumably, the records on which it was based would thus not have been of significance to the defense. Indeed, although the same counsel, Maurice Edelbaum, Esq., appeared for the defense in the three prior trials. the transcripts of the second and third trials indicate that the records in question were not used in those trials, counsel apparently having concluded that they were valueless. In view of the delay in serving the subpoena, counsel's unexplained refusal to adopt the nearly, if not wholly equivalent procedure of reading to the jury the record at the first trial, and the fact that the records sought to be produced do not, so far as we can see, impeach the government's case, it was not reversible error to refuse to enforce the subpoena. Bandy v. United States, 296 F.2d 882, 891–892 (8 Cir., 1961), cert. denied, 369 U.S. 831, 82 S.Ct. 849, 7 L. Ed.2d 796 (1962); see Goldsby v. United States, 160 U.S. 70, 16 S.Ct. 216, 40 L. Ed. 343 (1895).

■ The defendant objects to the charge to the jury, particularly the judge's comment in reference to Nirenberg, "I can't make you disbelieve him." Nirenberg was a convicted felon serving a sentence which he believed would last for the rest of his life. After testifying on direct examination that the defendant was not his accomplice in the bank robbery, Nirenberg contemptuously refused to state on cross-examination who his accomplice was, in obedience to his principles and in fear of being branded as a stoolpigeon on his return to prison. In these circumstances, it is hard to believe that any jury would have given any weight to Nirenberg's exoneration of the defendant. But in any event, the judge repeatedly charged the jury that it alone must determine the facts and the weight to be given to the testimony of the various witnesses. Furthermore, it is plain from the context of the remark to which objection is made, that the full import of the remark was that the jury should consider in evaluating Nirenberg's testimony his fearlessness of conviction for perjury, there being no further penalty

in the armory of the government, and his contempt for the processes of law:

"He [Nirenberg] says on this trial for the first time that this defendant is not the No. 2 man. If you believe him, acquit him. If you believe that this defendant was not the No. 2 man at any time in your discussions of the evidence, he must be acquitted of both counts immediately.

"But when you get to Nirenberg's testimony, keep in mind his background, keep in mind what he said, that he would not be a stool pigeon. In other words, he looked you right in the eye and said, 'I will protect the guilty and that is as far as I will go.' And that is what he did when he refused to name the No. 2 person. I was helpless to do anything, but I did direct him to answer and I could do nothing further.

"Now, if this defendant is not the No. 2 man, there is a No. 2 man on the street somewhere. I don't know where. But Nirenberg didn't help us find him. It is your function to place whatever weight on his testimony you wish. If you want to believe him, believe him, ladies and gentlemen. I can't make you disbelieve him.

"But approach his testimony with care and caution, looking at the background of it all. It is a very important part of your duties." Transcript pp. 1150–51.

In the very next sentence, the judge referred to the presumption of innocence. In these circumstances, the remark to the jury, albeit strongly phrased, was not prejudicial error.

The defendant presents in minute detail portions of the transcript which, he argues, show the trial judge's bias against the defendant. Special notice is taken of the judge's statement to the jury after the return of its verdict:

"The case has been reversed on technicalities three times. So now you can understand why I was very solicitous about giving the defendant everything he wanted because ordinarily he wouldn't get half of what I gave him. But due to the three reversals, it put me in a spot that I must justify my colleagues to some extent and the only way to justify them is to get a guilty verdict by giving the defendant everything he wanted—statements, Grand Jury minutes, photographs; and you were not fooled one minute by it. I congratulate you heartily and I hope I live long enough to see some of you come back to my jury again. Thank you very much." Transcript p. 1184.

It hardly requires mention here that the duty of a trial judge is solely to carry out the requirements of the law; it is the fair administration of justice and nothing else that justifies our legal system and the participants in it. We pass without comment the trial judge's gratuitous characterization of our prior decisions in this case as based on "technicalities."

While the judge's comment was highly undesirable, it was obviously not prejudicial since the jury's verdict had already been received. Nor, we think, does the record support the defendant's contention that the comment was merely an explicit statement of the judge's attitude, manifested throughout the trial in ways harmful to the defense. Indeed, cast in one light, the comment suggests an attitude of undue deference to the demands of the defense during the trial. It is true that there were frequent exchanges between defense counsel and the trial judge, and there is some evidence of antagonism between them. Whether the printed record accurately reflects the temperature of the trial we have no way of knowing; words read on paper have different meanings from the same words spoken in the heat of debate.

The important fact, however, is that we find neither actual nor apparent prejudice to the defense in the record of the trial. We could wish for less passion and more understanding between court

and counsel. But since in our opinion the defendant did in fact receive a fair trial and the trial also appeared to be fair, we see no ground for reversing the conviction. We add that the proof of the defendant's guilt, four times in question and four times found by a jury, appears to us to be overwhelming.

 Having concluded that the defendant has been fairly tried and convicted, we must consider whether the mere fact that three prior convictions were reversed requires that the present conviction be set aside. We think it does not. This is, of course, not a case in which unwarranted delay by the government deprived the defendant of a speedy trial. Nor can the defendant's suggestion that the government deliberately acted so as to deprive the defendant of a speedy trial be taken seriously; plainly the government has all along wanted nothing more than to secure a valid conviction. The second and third convictions were on different counts of the indictment, the third trial being necessitated by the jury disagreement at the second. Both trials were reversed for the same error in application of the Jencks Act. The two cases, Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); United States v. McKeever, 271 F.2d 669 (2 Cir., 1959), on which we principally relied in reversing the second and third trials, see 280 F.2d at 412, were decided after those trials were completed. This is not a case in which the government's errors were so flagrant and so persistent that the defendant, convicted after a fair trial, should be discharged. Cf. Euziere v. United States, 266 F.2d 88, 91 (10 Cir., 1959), vacated and remanded on other grounds, 364 U.S. 282, 80 S.Ct. 1615, 4 L.Ed.2d 1720 (1960). Nor has the defendant shown any prejudice to the defense, such as the unavailability of

evidence or witnesses, resulting from the delay preceding the fourth trial.[3]

We gratefully acknowledge the able assistance to this court and to the district court of C. Joseph Hallinan, Jr., Esq., who served as assigned counsel for the defendant at the trial and on this appeal, as well as on the appeal from the conviction at the second trial.

Affirmed.

---

3. The defendant's total time in prison was not increased by the long delay between the indictment and the imposition of a valid sentence. At the first trial, Judge Bruchhausen sentenced the defendant to a maximum term of twenty-two years imprisonment (November 15, 1956). At the fourth trial, the defendant was sentenced on April 14, 1961, to a maximum term of twenty years. When sentence was imposed at the fourth trial, the defendant had still not finished serving a previous state sentence.