UNITED STATES of America

v.

Kevin HARRISON, Appellant.

UNITED STATES of America

v.

Isaac PENDERGRAST, Appellant.

UNITED STATES of America

v.

Juan GORDON, Appellant.

Nos. 74–2029 to 74–2031.

United States Court of Appeals, District of Columbia Circuit.

Argued June 9, 1975.

Decided Dec. 8, 1975.

Louis Rabil, Washington, D. C. (appointed by this court), for appellants.

Mary Elizabeth Medaglia, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and Eugene M. Propper, Asst. U. S. Attys., were on the brief, for appellee.

Before WRIGHT and ROBINSON, Circuit Judges, and BLAIR,* District Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

At trial appellants were found guilty of armed robbery of a federally insured savings and loan association, in violation of 18 U.S.C. § 2113(d) (1970), and were sentenced to various terms of imprisonment. The only substantial issue on this appeal arises from the deliberate destruction, pursuant to long-standing agency practice, of rough handwritten notes taken by agents of the Federal Bureau of Investigation in interviewing the key eyewitnesses shortly after the robbery. In *United States v. Bundy*, 153 U.S.App.D.C. 191, 192, 472 F.2d 1266, 1267 (1972) (*per curiam*), following our decision in *United States v. Bryant*, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971),[1]

---

* Of the United States District Court for the District of Maryland, sitting by designation pursuant to 28 U.S.C. § 292(d) (1970).

1. In *Bryant* we held that

 sanctions for nondisclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve *all* discoverable evidence gathered in the course of a criminal investigation. The burden, of course, is on the Government to make this showing. * * * Although we leave it up to the agencies to draft rules suited to their own method of operation, all such rules will be subject to review ·of their adequacy to the assigned task.

 *United States v. Bryant*, 142 U.S.App.D.C. 132, 142, 439 F.2d 642, 652 (1971) (emphasis in original).

Several commentators have recognized the importance of the *Bryant* requirements for regulating the actions of investigative agencies and other arms of the prosecution. *See, e.g.,* Davis, *An Approach to Legal Control of the Police,* 52 *Tex.L.Rev.* 703, 712 (1974); Comment, *Judicial Response to Governmental Loss or Destruction of Evidence,* 39 *U.Chi.L.Rev.* 542, 558–563 (1972); Note, *Criminal Procedure: Government Has Duty to Implement Effective Guidelines to Preserve Discoverable Evidence,* 1971 *Duke L.J.* 644; *K. Davis, Administrative Law Text* 47, 50, 151 (3d ed. 1972). *See also* McGowan, *Rule Making and the Police,* 70 *Mich.L.Rev.* 659 (1972); Amsterdam, *The Supreme Court and the Rights of Suspects in Criminal Cases,* 45 *N.Y.U.L.Rev.* 785, 813–815 (1970) (stresses importance of police rulemaking and argues that such rulemaking may be constitutionally required); *American Bar Association Project on Standards for Criminal Justice, Standards Relating*

we held that such notes when taken by police officers "should be kept and produced." We find no principled basis for excluding agents of the FBI from this rule. We hold that rough interview notes, including those described in this case, fall within the category of potentially discoverable materials required to be preserved and produced under *Bryant* and *Bundy*. We conclude further that, under the circumstances, this case is not an appropriate one for the imposition of full *Bryant* sanctions.

I

At about 11:00 a. m. on March 1, 1974, a number of young men entered the Home Federal Savings and Loan Association. One held a gun on the assistant manager, who was standing behind the first teller's window, while another, later identified as appellant Pendergrast, vaulted the counter and began scooping money out of the cash drawers. A third, later identified as appellant Gordon, attempted to vault the counter, failed, and remained directly in front of one of the tellers while his companion was gathering the money. A fourth man, identified as appellant Harrison, went over and sat by the receptionist's desk, holding his hand in his pocket as though he had a gun. When the cash drawers had been emptied, the one man jumped back over the counter, and all the robbers left.

Meantime the silent alarm and camera had been activated. When developed, the photographs showed the man behind the counter and the man who tried unsuccessfully to jump the counter; the photos were used in the investigation

---

*to the Urban Police Function* § 4.3 (Approved Draft 1973) (encourages adoption by police of regulations governing discretionary functions).

Other jurisdictions have relied heavily on *Bryant* in fashioning similar prophylactic rules or in dismissing a case where the Government had failed to preserve important evidence. *People v. Hitch*, 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361, 369 (1974) (in bank) (quoting *Bryant* extensively, California Supreme Court requires that prosecutor must, for the future, be able to show rigorous procedures designed to preserve ampoules used in breathalyzer test); *People v. Churba*, 76 Misc.2d 1028, 353 N.Y.S.2d 130 (Crim.Ct.1974) (quoting *Bryant*, court dismisses information where evidence was lost and procedures to preserve evidence were haphazard and careless). *See also Wimberly v. Superior Court*, 45 Cal.App.3d 486, 119 Cal.Rptr. 514 (Ct. of Appeal 1975).

*Bryant* has been implemented by the Metropolitan Police of the District of Columbia, which issued General Order 601 shortly after our decision. It requires preservation of broad categories or potentially discoverable information, including rough notes of the kind at issue here. *See United States v. Bundy*, 153 U.S. App.D.C. 191, 192–193 n. 3, 472 F.2d 1266, 1267–1268 n. 3 (1972). The effectiveness of the General Order is well-illustrated in this case. The Metropolitan Police, unlike the FBI, were able to turn over to the defendants the rough notes of the interviews which the police investigators had held with the three key eyewitnesses. Trial Tr. at 40, 74–75.

The Metropolitan Police regulations governing preservation of evidence have figured in numerous other cases. *See, e.g., United States v. Scriber*, 163 U.S.App.D.C. 36, 43 n. 44, 499

F.2d 1041, 1048 n. 44 (1974); *United States v. Patterson*, 161 U.S.App.D.C. 281, 286–287 n. 7, 495 F.2d 107, 112–113 n. 7 (1974); *United States v. Clemons*, 144 U.S.App.D.C. 235, 238 n. 7, 445 F.2d 711, 714 n. 7, *cert. denied*, 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971); *id.*, 144 U.S.App.D.C. at 239–240, 445 F.2d at 715–716 (Bazelon, J., concurring); *Hardy v. United States*, 316 A.2d 867 (D.C.C.A.1974); *Banks v. United States*, 305 A.2d 256 (D.C.C. A.1973).

Finally, this court has several times had occasion to restate the importance of *Bryant*, especially as it applies to the preservation of rough interview notes. *See, e.g., United States v. Maynard*, 155 U.S.App.D.C. 223, 230, 476 F.2d 1170, 1177 (1973); *United States v. Bundy, supra; United States v. Barnes*, 150 U.S. App.D.C. 319, 322, 464 F.2d 828, 831 (1972) (Fahy, J., concurring), *cert. denied*, 410 U.S. 986, 93 S.Ct. 1514, 36 L.Ed.2d 183 (1973); *United States v. Hines*, 147 U.S.App.D.C. 249, 264 n. 14, 455 F.2d 1317, 1332 n. 14, *cert. denied*, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972). Although some of our decisions suggest that *Bryant* does not apply with full force to certain government instrumentalities such as jails, *United States v. Butler*, 163 U.S. App.D.C. 1, 3, 499 F.2d 1006, 1008 (1974), or magistrates, *United States v. Carpenter*, 166 U.S.App.D.C. 358, 510 F.2d 738 (1975), none of our holdings diminishes the applicability of *Bryant* to investigative agencies, a category to which the FBI obviously belongs. *See United States v. Butler, supra* (*Bryant* is "directed to the obligation of investigative agencies"). *See also Johnson v. United States*, 336 A.2d 545 (D.C.C.A.1975).

and were admitted into evidence at trial. Police and FBI agents arrived very soon after the robbers left. They interviewed the three eyewitnesses, and took rough notes as the interviews progressed. Within a few days thereafter, all the FBI agents, using their rough notes, which consisted largely of key words and phrases, dictated reports of the interviews and had the reports typed on the FBI's standard form FD–302. After checking the typed version for accuracy, each agent discarded the rough notes, in accordance with regular FBI practice. Within the next few weeks, in an effort to identify the robbers, the witnesses were shown various photo arrays, and at a line-up on March 20, they identified Gordon and Harrison. Appellants were indicted on April 18.

At trial the prosecution presented an abundance of strong evidence against the defendants. The three eyewitnesses identified the three defendants in the courtroom, and there was testimony that they had previously identified two of them at the line-up. The photos taken at the bank allegedly showing Gordon and Pendergrast were admitted into evidence, and police officers testified that Gordon, after being advised of his rights, had orally confessed to the crime on the day of arrest and that he had made certain other incriminating statements. Pendergrast and Harrison presented alibi defenses, while Gordon offered no evidence in his behalf. The jury convicted all three of armed robbery of a federally insured savings and loan, and all three were sentenced under the Youth Corrections Act, 18 U.S.C. § 5010 (1970).

The defendants appealed, charging primarily that the court should have applied sanctions to the Government under *United States v. Bryant, supra,* for the failure to preserve and produce the rough notes of the FBI interviews, a point they had properly raised at the pretrial hearing.[2] After oral argument, we concluded that we did not have sufficient information on the FBI regulations and practices to rule on the claim. We therefore remanded the case to the District Court to answer five specific questions[3] concerning, as we put it relying on the Government's representation, "the FBI regulation on destruction of rough or raw notes." The District Court held a hearing on the questions. The testimony revealed that the FBI has no regulation *requiring* destruction of rough interview notes, although it does maintain a fairly extensive set of regulations defining which materials are to be preserved. Since there was, strictly speaking, no "regulation on destruction" of notes, as distinguished from a more or less uniform practice, the District Court found it unnecessary to answer three of the five questions. Under the circumstances, it would have been much more helpful if the District Court had not taken such a narrowly literal view of our questions. Nonetheless, the court's findings, combined with the record and exhibits from the remand hearing, have provided us

**2.** Trial Tr. at 149–153, 220. The prosecutor did turn over to the defense before trial the police officers' rough interview notes and the FBI's "302 reports," which are the formal typewritten interview reports prepared from the rough notes and recorded on Form FD–302. Trial Tr. at 74–75. Testimony of an FBI agent established that the notes had been destroyed pursuant to long-standing FBI practice, a practice the agent erroneously described as "a mandatory rule within the FBI that no investigative notes be maintained for a period in excess of 90 days unless a bona fide serious reason exists to the contrary." Trial Tr. at 212. The Government also originally represented to us on this appeal that there exists such a rule. Government brief at 3 n. 4. *See also* Trial Tr. at 40–41.

**3.** Those five questions were:
1. What is the FBI regulation on destruction of rough or raw notes?
2. What purpose is the regulation intended to serve?
3. Was the regulation complied with in this case?
4. Does the regulation comply with the requirements of *United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642 (1971)?
5. If not, was any error with respect to compliance with *Bryant* harmless under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as to each appellant?

with sufficient information for measuring the FBI practice against the *Bryant* requirements.

## II

It was established at the hearing on remand that the FBI has for many years had a series of regulations governing the preservation of written records of witness interviews. In response to the Supreme Court's decision in *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), the Director issued Bureau Bulletin No. 57–1,[4] establishing the Interview Report Form, FD–302, to be used to record and preserve the final copy of a witness's statement whenever it is anticipated that the witness might testify in court. Adoption of the Jencks Act, 18 U.S.C. § 3500, and the issuance of later court decisions prompted additional refinements. After the Supreme Court's decision in *Campbell v. United States (Campbell I)*, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961), the Director inquired of the Assistant Attorney General, Criminal Division, whether rough interview notes should in the future be retained.[5] Assistant Attorney General Miller replied that the Department of Justice did not consider that the *Campbell* case had changed the rules on preservation of notes. He went on to outline the rules which should govern retention:

The types of written material developed in interviewing witnesses, and which should be retained, are the following:

1. Written statements, signed by the witness.

2. Written statements, unsigned by the witness, but approved or adopted in any manner by the witness.

3. Notes which are a substantially verbatim recital of an oral statement by the witness. This would cover shorthand, speedwriting, or longhand notes, as long as they are substantially verbatim and complete in recording what the witness said on interview. Even here, a transcription of the notes would suffice for the purposes of production, but prudence would seem to dictate retention of the notes in case of any dispute about the accuracy of transcription.

4. Notes which have been read back to the witness, or which the witness has been allowed to read, and which have been approved or adopted by the witness as his account of the matters concerning which he is interviewed.

In other situations than those just set forth the agent's notes do not constitute a statement under the statute and need not be retained.[6]

The Bureau adopted this language verbatim and made it part of its Manual on Rules and Regulations;[7] it was this regulation that governed the actions of the FBI agents who interviewed the three key eyewitnesses at the savings and loan on the day of the robbery.

Other FBI regulations govern final preparation of the 302 report from the rough interview notes.[8] In order to assure the accuracy of the reports, the regulations require that the interviewing agent dictate or prepare a draft 302 report within five working days; it must then be typed and returned to the agent within another five working days. The agent is required to proofread the typed version and compare it with his notes for accuracy. Once this process is complet-

---

4. Government Exhibit No. 2 (all references to exhibits are to exhibits introduced at the hearing on remand).

5. Memorandum from Director, FBI, to Acting Assistant Attorney General, Criminal Division, Feb. 6, 1961, Government Exhibit No. 3.

6. Memorandum from Herbert J. Miller, Jr., Assistant Attorney General, Criminal Division, to

Director, Federal Bureau of Investigation, April 12, 1961, Government Exhibit No. 4.

7. Government Exhibit No. 1 at 2e (regulation 3).

8. Government Exhibit No. 1 at 5 (regulations 13, 16).

ed, the agent initials the report, and, unless the notes fall within one of the categories of the preservation regulation set forth above,[9] it is the practice then to destroy the notes, although no regulation specifically requires this. Every FBI agent who testified at the hearing on remand testified that he routinely destroyed the notes once the final 302 report was prepared and checked for accuracy.[10] In addition, there was testimony at the hearing that new agents are carefully taught in training school just what materials must be retained, and instructors stress that a 302 report must accurately and completely reflect the substance of the agent's notes.[11]

## III

The FBI's practice with regard to rough notes thus satisfies the first of the *Bryant* requirements: preservation of evidence pursuant to systematic procedures is detailed in the Manual of Rules and Regulations. It is clear, however, that the FBI practice fails the second *Bryant* requirement: the regulation is too narrow to fully protect the rights of the accused. *Bryant* requires that "in framing their rules for evidence preservation, investigative agencies must define discoverable evidence very broadly, including any materials that 'might' be 'favorable' to the accused" [12]—a reference to the disclosure obligation stem-

**9.** There is reason for concern, however, upon this record, about the efficacy of the preservation regulation as it is applied by agents in the field. For example, it may be that they do not apply, in any meaningful sense, the third subparagraph of the regulations, the provision requiring preservation of notes which are a substantially verbatim recording of a witness's statement. The testimony of Agent O'Reilly, one of the agents who interviewed witnesses in the bank on the day of the robbery, was representative. He emphasized that he would keep signed statements, but "[i]f you are talking about shorthand notes, I don't know of any regulation about that." Remand Tr. at 125. He did not qualify his statement in any way suggesting that he knew of a regulation requiring retention of shorthand notes which are substantially verbatim recordings of the witness's statements, even though the third subparagraph explicitly covers "shorthand, speedwriting, or longhand notes."

One other agent indicated an understanding like Agent O'Reilly's: full statements should be preserved, but not other kinds of notes. Remand Tr. at 103, 108 (Agent Slack). Agent Smith's testimony at trial is cause for even greater concern. Apparently unaware of the preservation regulation, he testified that all notes of whatever character had to be destroyed within 90 days, unless an unspecified "bona fide serious reason exists to the contrary." Trial Tr. at 212. The fourth field agent, Agent O'Connell, displayed a more thorough knowledge of the regulation, Remand Tr. at 153, but he, like the others, testified that he had never retained notes from a witness interview. Remand Tr. at 167. *See also* Remand Tr. at 108, 140–141 (testimony of Agents Slack and O'Reilly that they had never retained rough notes).

Nearly all agents who testified, whether they were field agents or not, expressed an understanding that the FBI's general policy is one requiring destruction of rough notes, except where there is a special reason justifying preservation. *See* Remand Tr. at 41, 48, 55, 91, 100, 123–125, 141, 167. After *Bryant* and *Bundy,* one might reasonably have expected the presumption to run the other way.

There is apparently additional confusion about the relation of the notes to the finished 302 reports. The trial testimony indicated that the report was a verbatim dictation of the notes. Trial Tr. at 211–212, Government brief at 3. Since the finished 302 reports were turned over as "Jencks material," Trial Tr. at 74, Government brief at 3, trial testimony left the distinct impression that the notes were likewise Jencks material. The Government has since receded from both of those positions. *See* Remand Tr. at 107, 126 (Agents Slack and O'Reilly indicate that the 302's are not verbatim dictation of notes); Government's Opposition to Appellant's Motion for Summary Reversal at 12 n. 6 (turning over the 302's was not necessarily a concession that the forms were "technically discoverable under the Jencks Act").

**10.** Remand Tr. at 48, 69, 108, 141, 150.

**11.** Remand Tr. at 62–66. The District Court found that the agents in this case acted in compliance with the regulation, Memorandum and Order at 7–8, and we accept that conclusion for the purposes of our consideration here. *But see* note 9 *supra.*

**12.** *United States v. Bryant, supra* note 1, 142 U.S.App.D.C. at 142 n. 21, 439 F.2d at 652 n. 21.

ming from *Brady v. Maryland.*[13] The FBI's regulation is designed to respond to the Jencks Act;[14] nothing in the regulation speaks to preservation of notes which might constitute *Brady* materials. The regulation was adopted verbatim from the Assistant Attorney General's 1961 memorandum, a memorandum directed solely to the question of what preservation the Jencks Act requires. There is no indication in the record that the regulations have been modified since 1961,[15] even though the 1963 *Brady* decision substantially broadened beyond the Jencks Act the possible grounds for production of materials to the defense. Nor is there any indication that the regulations were modified in response to *Bryant* in 1971 or *Bundy* in 1972.

It seems too plain for argument that rough notes from any witness interview could prove to be *Brady* material. Whether or not the prosecution uses the witness at trial, the notes could contain substantive information or leads which would be of use to the defendants on the merits of the case. If the witness does testify, the notes might reveal a discrepancy between his testimony on the stand and his story at a time when the events were fresh in his mind. The discrepancy would obviously be important for use in impeaching the witness' credibility. The possible importance of the rough notes for these purposes is not diminished in cases where the prosecutor turns over to the defense the 302 reports. The 302 reports contain the agent's narrative account of the witness's statement, prepared partly from the rough notes and partly from the agent's recollection of the interview.[16] Although the agents

---

**13.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Id.* at 87, 83 S.Ct. at 1196.

*See also Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *Giles v. Maryland,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed. 737 (1967); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

This circuit has consistently applied a generous definition of *Brady* materials. The prosecutor must disclose "evidence which * * * might have led the jury to entertain a reasonable doubt about [the defendant's] guilt." *Levin v. Katzenbach,* 124 U.S.App.D.C. 158, 162, 363 F.2d 287, 291 (1966). *See Levin v. Clark,* 133 U.S.App.D.C. 6, 408 F.2d 1209 (1967); *United States v. Bryant, supra* note 1, 142 U.S. App.D.C. at 138, 439 F.2d at 648. *See also Griffin v. United States,* 87 U.S.App.D.C. 172, 175, 183 F.2d 990, 993 (1950).

**14.** The Jencks Act, 18 U.S.C. § 3500 (1970), provides in pertinent part:

> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States

which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

> \* \* \* \* \* \*

> (d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

> (e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

> (1) a written statement made by said witness and signed or otherwise adopted or approved him;

> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

> (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

**15.** *See* Remand Tr. at 46.

**16.** *See* Remand Tr. at 75–79, 99, 135–136, 150, 160.

are trained to include all the pertinent information in the 302 report, there is clearly room for misunderstanding or outright error whenever there is a transfer of information in this manner. In the best of good faith, the statement as recorded in the 302 report may, to some degree at least, reflect the input of the agent. In such a situation, the information contained in the rough notes taken from the witness himself might be more credible and more favorable to the defendant's position.

 The regulations have left it to the agent to decide whether to retain the rough interview notes, and, as noted above, agents have regularly decided against retention. But the ultimate decision is not, in any event, for the agent to make. The decision on discoverability is emphatically a judicial decision.[17] Nor should this be a ground for any concern on the part of the FBI. A court which finds, on inspection, that the notes are not producible will not order production;

the Government then sacrifices nothing by having retained the notes. The point is simple and cannot be overemphasized. The courts, not the investigators nor the prosecutors, make the decision as to whether evidence is discoverable, and that decision cannot be made if the evidence has been destroyed. Obviously, in that event, the evidence cannot be produced. Hence the *Bryant* preservation rule.

## IV

The Government offers a number of arguments to justify its actions.

### A.

 It contends, first, that disposing of the notes was proper because they are not discoverable under the Jencks Act. It invokes numerous cases which state that the Jencks Act does not require the Government to preserve every scrap of paper connected with a criminal investigation,[18] and it suggests that such a re-

---

17. *See Levin v. Katzenbach, supra* note 13, 124 U.S.App.D.C. at 163, 363 F.2d at 292; *Levin v. Clark, supra* note 13, 133 U.S.App.D.C. at 9, 408 F.2d at 1212. Twenty-five years ago this court observed: "When there is substantial room for doubt, the prosecution is not to decide for the court what is admissible or for the defense what is useful." *Griffin v. United States, supra* note 13, 87 U.S.App.D.C. at 175, 183 F.2d at 993.

Rough notes might also be discoverable under the Jencks Act, 18 U.S.C. § 3500, notwithstanding an agent's judgment, applying the FBI regulation, that the notes do not constitute a producible "statement" under 18 U.S.C. § 3500(e). *See* note 9 *supra. Cf. Lee v. United States,* 125 U.S.App.D.C. 126, 368 F.2d 834 (1966) (applying Jencks Act sanctions for failure to preserve certain investigative reports). The Jencks Act determination, too, is for the court, not the agent. A long line of cases establishes this point beyond dispute. *See, e.g., Campbell v. United States (Campbell I),* 365 U.S. 85, 92–93, 95, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); *United States v. Johnson,* 521 F.2d 1318, 1319–1320 (9th Cir. 1975); *United States v. Bell,* 457 F.2d 1231, 1235 (5th Cir. 1972), *rev'd after remand,* 470 F.2d 1178 (1972); *Williams v. United States,* 117 U.S.App.D.C. 206, 208, 328 F.2d 178, 180 (1963).

This responsibility of the federal trial judge, it goes without saying, is not to be delegated

to the prosecutor. Questions of production of statements are not to be solved through one party's determination that they are not to be produced to defense counsel or to the trial judge for his determination as to their coverage.
*Palermo v. United States,* 360 U.S. 343, 361, 79 S.Ct. 1217, 1229, 3 L.Ed.2d 1287 (1959) (Brennan, J., concurring.).

18. *See Campbell I, supra* note 17, 365 U.S. at 102, 81 S.Ct. 421 (Frankfurter, J., concurring); *United States v. Comulada,* 340 F.2d 449, 451 (2d Cir.), *cert. denied,* 380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272 (1965); *United States v. Greco,* 298 F.2d 247, 250 (2d Cir.), *cert. denied,* 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962); *United States v. Thomas,* 282 F.2d 191, 194 (2d Cir. 1960).

We do not accept the notion that requiring the Government to preserve rough notes of witness interviews condemns it to preservation of every scrap of paper. Rough notes of witness interviews comprise a well-delineated category of materials, materials frequently sought by defendants because of their obvious potential use to impeach the witness. Separating materials of this sort deserving preservation from the mass of paper generated by an investigation thus imposes no substantial burden.

sult—not intended by the Act—would be the consequence of finding FBI rough notes to be within the *Bryant* and *Bundy* requirements.

The short answer to this contention is simply that the duty of preservation, as we have already shown, does not rest only on the Jencks Act. As *Bryant* made abundantly clear, the duty rests as well on the *Brady* requirement that material favorable to a defendant be disclosed, and to a lesser extent on Rule 16, *Fed.R.Crim.P.*[19] No matter what the Jencks Act was meant to require of prosecutors and investigators, *Brady* and Rule 16 remain as important foundations for a duty to preserve material which is subject to possible later disclosure.

### B.

The Government argues, secondly, that preservation of FBI agents' rough notes will impose an intolerable administrative burden on the Bureau. We are unmoved by this argument. There was testimony at the hearing that an average 302 report is approximately two pages long, and that the notes are usually shorter than the report. Remand Tr. at 116, 157. We are not convinced that addition of a page or two for each witness creates insuperable space problems. Certainly measures, such as reducing some documents to microfilm, could be devised to cope with any housing difficulties. And there is plainly no need for elaborate new systems to keep track of the notes. They could simply be stapled to the 302 reports. In any event, administrative

convenience has traditionally fared poorly as an asserted justification for government action infringing important rights of individuals,[20] and the minimal burden here does not outweigh the significant values to be served by preservation.

### C.

As a final justification for its actions, the Government asserts that destruction of the notes is proper because all of the information is preserved in the 302 report in a form far more intelligible to the defense than the often cryptic and fragmentary notes ever could be. Undeniably preparation of the report is a laudable practice, one which does in many cases prove helpful to the defendant as well as to the prosecution. Naturally, we assume that in the vast majority of cases transfer of information from the notes to the report has been accurate and complete, thus making the reports more useful to defendants than the notes.[21]

But the Government's argument asks us to assume too much; it asks us to believe that the FBI never makes a mistake, and that, therefore, the 302 reports always embody accurately everything contained in the notes. It is obvious, however, that even the most conscientious agent can err, despite careful training and despite his rechecking the report against the notes before destroying the latter. Moreover, there are certain factors peculiarly conducive to error where, as in this case, the notes contain key

---

19. *United States v. Bryant, supra* note 1, 142 U.S.App.D.C. at 137–138, 439 F.2d at 647–648.

20. *See generally Taylor v. Louisiana*, 419 U.S. 522, 535, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 263, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *Frontiero v. Richardson*, 411 U.S. 677, 690, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality opinion); *Goldberg v. Kelly*, 397 U.S. 254, 265–266, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

21. Of course, in the ordinary case the reports are far more useful to the prosecution as well. For this reason, we cannot countenance the

Government's suggestion that it might discontinue the reports if it is required to keep the rough notes. Government's Memorandum in Support of Proposed Findings of Fact and Conclusions of Law, at 7 n. 6. There was testimony at the hearing that notes would in many cases be of no value to anyone but the agent who took them, Remand Tr. at 24, and even the author would have difficulty deciphering them as time passed, Remand Tr. at 84, 115, 147. Since the reports are of such value to the investigation and prosecution, we are confident that the use of interview report forms will continue.

identifying data provided by eyewitness- es. As we stated in *Bundy*:

> The initial description of an assailant by the victim or other eyewitness is crucial evidence, and the notes taken of that description should be kept and produced. The formal written police report of the crime does, of course, contain a description of the offender, but that report is often prepared after a suspect is arrested and the danger that the description in the formal report may be subconsciously influenced by the viewing of the suspect by the author of the report is very great.[22]

And certainly we cannot consider it beyond the bounds of possibility that a re-

port be distorted because of overzealousness on the part of the agent preparing it, *compare Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), since preparation of the report and the decision whether or not to preserve the notes are entirely within the discretion of a single agent acting alone.[23] Once again, it was precisely the purpose of the prophylactic rule announced in *Bryant* to provide some safeguard against these kinds of errors and distortions, and thereby to foster the search for truth in a criminal trial.[24]

The Government cites cases from other circuits declining to impose sanctions on the FBI for its practice of destroying the rough notes.[25] Many of these cases,

22. *United States v. Bundy*, *supra* note 1, 153 U.S.App.D.C. at 192, 472 F.2d at 1267 (footnote omitted).

23. Remand Tr. at 13, 69–70, 85, 91, 100, 115, 124, 148, 163.

24. At least one of the agents in this case knew of a recent incident involving an agent in his office where a discrepancy appeared between the notes and the interview report. Trial Tr. at 219. *See also* Trial Tr. at 153.

25. *See, e.g., United States v. Hurst*, 510 F.2d 1035, 1036 (6th Cir. 1975); *United States v. Stephens*, 492 F.2d 1367, 1377 (6th Cir.), *cert. denied*, 419 U.S. 852 & 874, 95 S.Ct. 93, 42 L.Ed.2d 83 (1974); *United States v. Pacheco*, 489 F.2d 554, 565–566 (5th Cir. 1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975); *United States v. Lane*, 479 F.2d 1134, 1135–1136 (6th Cir.), *cert. denied*, 414 U.S. 861, 94 S.Ct. 78, 38 L.Ed.2d 112 (1973); *United States v. Cruz*, 478 F.2d 408, 412–413 (5th Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973); *United States v. Terrell*, 474 F.2d 872, 877 (2d Cir. 1973); *United States v. Mechanic*, 454 F.2d 849, 857 (8th Cir. 1971), *cert. denied*, 406 U.S. 929, 92 S.Ct. 1765, 32 L.Ed.2d 131 (1972); *United States v. Lepiscopo*, 429 F.2d 258, 260 (5th Cir.), *cert. denied*, 400 U.S. 948, 91 S.Ct. 255, 27 L.Ed.2d 254 (1970); *United States v. Graves*, 428 F.2d 196, 199–200 (5th Cir.), *cert. denied*, 400 U.S. 960, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970); *Wilke v. United States*, 422 F.2d 1298, 1299 (9th Cir. 1970); *United States v. Fruchtman*, 421 F.2d 1019, 1021–1022 (6th Cir.), *cert. denied*, 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 86 (1970); *United States v. Missler*, 414 F.2d 1293, 1304–1305 (4th Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970); *United States v. Covello*, 410 F.2d 536,

545 (2d Cir.), *cert. denied*, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969); *Matthews v. United States*, 407 F.2d 1371, 1376–1377 (5th Cir. 1969), *cert. denied*, 398 U.S. 968, 90 S.Ct. 2177, 26 L.Ed.2d 554 (1970); *United States v. Hensley*, 374 F.2d 341, 353 (6th Cir.), *cert. denied*, 388 U.S. 923, 87 S.Ct. 2139, 18 L.Ed.2d 1373 (1967); *United States v. Baker*, 358 F.2d 18, 20–21 (7th Cir.), *cert. denied*, 385 U.S. 869, 87 S.Ct. 135, 17 L.Ed.2d 96 (1966); *United States v. Hoffa*, 349 F.2d 20, 47–48 (6th Cir. 1965), *aff'd*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. Hilbrich*, 341 F.2d 555, 557 (7th Cir.), *cert. denied*, 381 U.S. 941, 85 S.Ct. 1775, 14 L.Ed.2d 704 (1965); *United States v. Comulada*, 340 F.2d 449, 450–451 (2d Cir.), *cert. denied*, 380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272 (1965); *United States v. Johnson*, 337 F.2d 180, 201–202 (4th Cir. 1964), *aff'd*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966); *United States v. Spatuzza*, 331 F.2d 214, 218 (7th Cir.), *cert. denied*, 379 U.S. 829, 85 S.Ct. 58, 13 L.Ed.2d 38 (1964); *Ogden v. United States*, 323 F.2d 818, 819–821 (9th Cir. 1963), *cert. denied*, 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86 (1964); *United States v. Tomaiolo*, 317 F.2d 324, 327–328 (2d Cir.), *cert. denied*, 375 U.S. 856, 84 S.Ct. 119, 11 L.Ed.2d 83 (1963); *United States v. Greco*, 298 F.2d 247, 249–250 (2d Cir.), *cert. denied*, 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962); *United States v. Thomas*, 282 F.2d 191, 193–195 (2d Cir. 1960).

There are, however, other reported cases where disclosure of rough notes has been ordered, although the facts underlying the production orders in those cases have not been entirely clear. *Papworth v. United States*, 256 F.2d 125, 129–130 (5th Cir.), *cert. denied*, 358 U.S. 854, 79 S.Ct. 85, 3 L.Ed.2d 88 (1958); *United States v. Clancy*, 276 F.2d 617, 634 (7th Cir. 1960), *rev'd on other grounds*, 365 U.S.

it should be noted, give only summary treatment to the issue.[26] Although some seem to indicate that the practice itself is unobjectionable,[27] most simply hold that the District Court's decision not to impose sanctions was, in the circumstances of the particular case, not erroneous.[28] Several of the courts which have declined sanctions, moreover, have been strongly critical of the FBI practice, even where they felt it necessary, under the circumstances, to uphold the conviction notwithstanding the destruction.[29] Above all, the cited cases focus only on what preservation the Jencks Act requires. All the cases but one[30] fail even to mention *Brady v. Maryland*, and that one gives no real consideration

to the possibility that rough notes might be *Brady* material.[31]

We decline to follow the cases the Government cites to us, first, because they fail sufficiently to recognize that it is the court, not the investigator, who must make the judgment as to what evidence is discoverable and, therefore, must be preserved; second, in those cases which seem to concede that this judgment is a judicial one, destruction of the evidence is excused on reasoning infected with fundamental error. That reasoning follows a common pattern: the destruction is not grounds for reversal because the court finds that the agent has acted in accordance with normal agency procedures,[32] and that the

---

312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961); *United States v. DeLeon*, 498 F.2d 1327, 1333–1334 (7th Cir. 1974). *See also United States v. Wilcox*, 507 F.2d 364, 374 (4th Cir. 1974), *cert. denied*, 420 U.S. 979, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975) (prosecutor turned over rough notes before cross-examination of witness).

**26.** *See, e.g., United States v. Hurst*; *United States v. Terrell*; *United States v. Mechanic*; *United States v. Lepiscopo*; *Wilke v. United States*; *United States v. Hensley*; *United States v. Spatuzza*; *United States v. Tomaiolo*, all *supra* note 25.

**27.** *See, e.g., United States v. Hurst*; *United States v. Pacheco*; *United States v. Lane*; *United States v. Covello*; *United States v. Comulada*; *United States v. Greco*, all *supra* note 25.

**28.** *See, e.g., United States v. Cruz*; *United States v. Mechanic*; *United States v. Lepiscopo*; *United States v. Graves*; *Wilke v. United States*; *United States v. Fruchtman*; *United States v. Missler*; *Matthews v. United States*; *United States v. Hensley*; *United States v. Baker*; *United States v. Hoffa*; *United States v. Hilbrich*; *United States v. Johnson*; *United States v. Thomas*, all *supra* note 25.

**29.** *See, e.g., United States v. Missler*; *United States v. Johnson*; *United States v. Thomas*, all *supra* note 25. In *Johnson*, the court wrote:

> This is not the first time that a court has been called upon to consider the effect of the destruction of FBI interview notes. [citations omitted] Each time the problem has arisen the FBI has claimed that the notes were destroyed as part of FBI routine. This is really not a satisfactory answer. Where the agent testifies to matter he claims not to be in the notes and the defendant insists on

a different version, an issue arises which may not be satisfactorily resolved in the absence of the original notes. If the notes were available, they might confirm or refute one version or the other. One of the purposes of both the Jencks decision and the Jencks Act is to afford the defense an opportunity to impeach witnesses. *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); *United States v. Wenzel*, 311 F.2d 164, 171 (4th Cir. 1962). The destruction of interview notes does not advance this purpose. Of course, a district court may find as a fact that the notes were not a substantially verbatim record, or that they were accurately copied into a report and then destroyed in good faith, but the necessity for inquiries along this line can be avoided by the preservation of notes until after the trial. Eliminating uncertainty may serve the interest of the Government no less than the defendant.

337 F.2d at 201–202.

**30.** *United States v. Hurst*, *supra* note 25.

**31.** It hardly needs to be added that none of the cited cases purports to be an application of the *Bryant* rule to FBI destruction of rough notes. None of the cases even mentions *Bryant*.

**32.** We adverted in *Bryant* to the problems inherent in relying too readily on "normal" or "regular" agency practice:

> Of course, the regular procedures for preservation must be adequate to the task; systematic non-preservation of tapes involving Government undercover agents—as in the cases before us—might be regular, but would be insufficiently protective of defendants' right to discovery.

*United States v. Bryant*, *supra* note 1, 142 U.S. App.D.C. at 142, 439 F.2d at 652.

defendant has made no showing of either bad faith or a failure to transfer to the interview report all the data that appeared in the notes.[33] In nearly every such case,[34] however, the only solid evidence a defendant could offer to show either bad faith or failure to transfer all data would come from producing the notes themselves—exactly the course he cannot pursue because of the agency's practice. Without the notes, which, of course, would be the best evidence, he is reduced to trying to show a discrepancy in the 302 report by cross-examining the witness who was the subject of the interview, a witness who was prepared for

testifying, not by reading the rough notes, but by using the 302 report. There could hardly be a less auspicious setting for eliciting testimony that will cast doubt on the accuracy of the interview report. Cross-examining the agent will be no more helpful. If there was an honest mistake in preparing the 302 report, one that escaped the agent when he rechecked the report, it is most unlikely that he will suddenly recall the error on the stand. If any discrepancy was the result of misunderstanding or deliberate action, the agent plainly is the most unlikely source of that information.[35]

**33.** *See* Comment, *supra* note 1, at 548–552.

Most of the cases upholding the FBI practice rely on an oft-cited passage from *Killian v. United States,* 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961). Defendants there sought a number of materials relating to the testimony of two government informers. Because of important factual questions which could not be settled on the record as it then stood, a remand was necessary. In the course of giving guidance to the District Court on the standards to be applied on remand, Justice Whittaker wrote for the Court the following directions, concerning rough notes of certain expenses of one of the informers, Ondrejka:

> If the agents' notes of Ondrejka's oral reports of expenses were made only for the purpose of transferring the data thereon to the receipts to be signed by Ondrejka, and if, after having served that purpose, they were destroyed by the agents in good faith and in accord with their normal practice, it would be clear that their destruction did not constitute an impermissible destruction of evidence nor deprive petitioner of any right.

*Id.* at 242, 82 S.Ct. at 308.

*Killian* does not conflict with our holding here. The expense notes upon which the Court was focusing are by no means the kind of "crucial" evidence involved in this case, statements by key eyewitnesses containing their initial identifications of the suspects. *See* note 39 *infra.* If the remand in *Killian* resulted in a new trial, the defendants were to have access to any final receipts which contained information relating to the witness' testimony. 368 U.S. at 239, 82 S.Ct. 302. Moreover, the Government had offered at the first trial to provide a complete list showing all payments to the informant for expenses and services. *Id.* at 238, 82 S.Ct. 302. The important fact, going to Ondrejka's credibility, was therefore already established—that Ondrejka was indeed a well-paid government informant.

Any discrepancy between the notes of expenses Ondrejka reported and the receipts showing money actually paid would have availed the defendant almost nothing. We cannot accept the notion that in focusing on such an unimportant category of evidence as this, the Supreme Court was announcing doctrine meant to cover even notes of substantive statements given by important witnesses. Perhaps the most persuasive evidence that the Court had no such intention is the fact that *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), came down a mere two years later but made no mention of *Killian.*

**34.** We have found only one case where the defendant prevailed because he was able to bring in other evidence that there was a discrepancy between the destroyed materials and the final 302 report. *United States v. Lonardo,* 350 F.2d 523 (6th Cir. 1965). *Cf. Lee v. United States, supra* note 17. Other courts have pointed to *Lonardo* as an indication that it is not impossible for the defendant to show discrepancies. *See, e.g., United States v. Terrell, supra* note 25, at 877 n. 3. But *Lonardo* provides little solace to most defendants confronted with FBI destruction of rough notes; it was a highly unusual case. There the destroyed material was a stenographic transcript of the witness's statement. The stenographer, present during the entire interview and presumably a neutral third party, testified that there was a discrepancy between the contents of the transcript and the report. In contrast, nearly all interviews which result in an agent's rough notes will not involve the presence of a neutral third party.

**35.** *Cf. State v. Amundson,* 69 Wis.2d 554, 230 N.W.2d 775, 788 (1975); *United States v. Johnson, supra* note 17, 521 F.2d at 1320. In the latter case the agent testified at trial and the defendant sought the notes the agent had taken during a witness interview, arguing that they were a producible statement of the agent

■ In the fountainhead case of *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), the Supreme Court, in a slightly different context, set forth principles which cast profound doubt on the reasoning of the cases the Government cites to us:

> Requiring the accused first to show conflict between the reports and the testimony is actually to deny the accused evidence relevant and material to his defense. The occasion for determining a conflict cannot arise until after the witness has testified, and unless he admits conflict, * * * the accused is helpless to know or discover conflict without inspecting the reports. A requirement of a showing of conflict would be clearly incompatible with our standards for the administration of criminal justice in the federal courts and must therefore be rejected.[36]

Finding the Government's destruction of the notes to be harmless because the defendant has not demonstrated a discrepancy between notes and report is to reinstate the requirement that a defendant must show a conflict before being entitled to relevant materials. That result is not only in flat conflict with the rationale of *Jencks,* it ignores the teaching of *Brady* and the literally hundreds of cases decided under it.[37]

■ In this circuit the law, at least since 1971, has been the preservation rule set forth in *Bryant* and applied specifically to rough notes of witness interviews in *Bundy,* a rule which rests squarely on *Brady* and *Jencks.* Such notes, we held, "should be kept and produced" so that the *trial court* can determine whether the notes "should be made available to the defendant under *Brady* or the Jencks Act." [38] This rule is clearly intended to safeguard vital rights of the defendant; it cannot be undercut by an administrative practice permitting destruction of potential evidence.[39]

himself under 18 U.S.C. § 3500(e)(1) because they had been "adopted or approved" by him. In remanding for the District Court to inquire into the question, the Court of Appeals remarked: "The question of whether an otherwise producible statement is useful for impeachment must be left to the defendant. * * * Certainly the answer should not rest with the very witness whose testimony the defendant seeks to impeach."

**36.** 353 U.S. at 667–668, 77 S.Ct. at 1013. The Jencks Act, 18 U.S.C. § 3500, was passed in response to the *Jencks* case and to certain extreme interpretations given the case by lower courts. *Palermo v. United States, supra* note 17, 360 U.S. at 346, 79 S.Ct. 1217. But the Supreme Court has held that the Act basically "reaffirms" the holding of the *Jencks* case, *Campbell v. United States (Campbell II),* 373 U.S. 487, 496 n. 12, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963), and certainly nothing in the Jencks Act remotely approaches a requirement that the defendant must now show conflict before being granted access to witness statements.

**37.** Were *Brady* and its progeny applicable only when the exact content of the non-disclosed materials was known, the disclosure duty would be an empty promise easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal.

*United States v. Bryant, supra* note 1, 142 U.S. App.D.C. at 148, 439 F.2d at 648.

**38.** *United States v. Bundy, supra* note 1, 153 U.S.App.D.C. at 192, 472 F.2d at 1267.

**39.** The District Court, on remand, accepted a fourth Government argument and found *Bryant* distinguishable on its facts from this case. Memorandum and Order at 7–8. It reasoned that destruction of the notes here was not an action as egregious as the destruction in *Bryant* of an actual tape of the illegal narcotics transaction. We do not find it productive to attempt to assess which materials— tapes of a transaction or notes of a witness interview—are more important. There can be no doubt that rough notes of the type involved here, containing the initial descriptions of the suspects offered by the key eyewitnesses shortly after the offense, are "crucial evidence." *United States v. Bundy, supra* note 1, 153 U.S.App.D.C. at 192, 472 F.2d at 1267. *See United States v. Hines,* 147 U.S.App.D.C. 249, 264 n. 14, 455 F.2d 1317, 1332 n. 14. A recorded initial description has also been recognized by the Supreme Court as a safeguard against the hazards of misidentification. *United States v. Wade,* 388 U.S. 218, 236 n. 26, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), quoting from Murray, *The Criminal Lineup at Home and Abroad,* 1966 *Utah L.Rev.* 610, 627–628. On the hazards of misidentification generally, *see United States v. Wade, supra,* 388 U.S. at

## V

■ The Government has not conformed its regulations or practices to the preservation requirements of *Brady, Bryant,* and *Bundy.* Ordinarily, government action of this sort would lead to the imposition of sanctions, for *Bryant* made it clear that there would be no exception for "good faith administrative decision that certain evidence is not discoverable and thus need not be preserved." [40] The good faith administrative decision involved here, however, was apparently made in reliance on the many cases in other circuits ostensibly approving the FBI's practice of destroying the notes.[41] We have indicated above our disagreement with the reasoning in most of those cases, but the FBI should not be judged too severely for acting in reliance upon them. This is especially so since this circuit has never squarely held that FBI, as distinguished from police, rough notes fall within the *Bryant* requirements. In fact, dictum in one of our cases [42] may even have contributed to the Bureau's reliance on the approval of the practice to be found in cases from other judicial circuits. In these circumstances, we think it is the sounder course to hold, as we do, that FBI rough notes of witness interviews fall within *Bryant*

and that the FBI's current regulations are inadequate, but to decide this particular case under the balancing test announced in *Bryant* for application to pre-*Bryant* cases. Full sanctions will be invoked in future cases unless the FBI's practices are modified to embody a suitably broad definition of discoverable evidence and to preserve rough notes from witness interviews.

The balancing test which governs this case was announced in *Bryant* in these words:

> [The court] should weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice.[43]

Here there was indeed negligence on the part of the FBI in failing to modify its regulations to comport with the *Brady, Bryant,* and *Bundy* requirements, but we cannot consider it to be action in bad faith, in light of the judicial approval which had been accorded the practice. The destroyed notes here were important, since they contained the crucial initial description given by eyewitnesses to the crime. Their importance, however, is diminished by the fact that the de-

228–239, 87 S.Ct. 1926; *Simmons v. United States,* 390 U.S. 377, 383–384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Foster v. California,* 394 U.S. 440, 441–443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

*Bryant* clearly applies. The District Court's conclusion to the contrary was legally erroneous.

**40.** *United States v. Bryant, supra* note 1, 142 U.S.App.D.C. at 142 n. 21, 439 F.2d at 652 n. 21.

**41.** *See* note 25 *supra.*

**42.** *United States v. Scriber, supra* note 1, 163 U.S.App.D.C. at 43, 499 F.2d at 1048. The holding of the case was that defendant could not raise the loss of the notes as an issue on appeal because he had failed completely to raise any *Bryant* or Jencks Act issues below. *Id.* The comment that "it has been held that rough, investigative notes taken by police officers at the scene of the crime are not 'substantially verbatim' statements within the coverage of the Jencks Act" was therefore clearly dic-

tum. It was also mistaken, at least insofar as it purported to state the law in this circuit. It cites *United States v. Hines, supra* note 39, 147 U.S.App.D.C. at 263–264, 455 F.2d at 1331–1332, as support for the quoted statement. But in *Hines* we specifically stated that since the loss of the notes took place before our decision in *Bryant,* we were not deciding that case under the stringent *Bryant* standards. Instead, we simply commented that the facts of the *Hines* case "underscore the importance" of the rule announced in *Bryant.* That the notes in that case were not producible under the Jencks Act says nothing about the need for preserving notes in the future under *Brady, Bryant,* and *Bundy* for inspection and possible production.

**43.** *United States v. Bryant, supra* note 1, 142 U.S.App.D.C. at 143, 439 F.2d at 653. In that case it was necessary to remand the case to the District Court for further factfinding and application of the balancing test. Here the record is sufficiently complete that we can apply the test ourselves.

fendants were supplied with the rough interview notes taken by the police within minutes of the FBI's interviews, which notes had been retained pursuant to the requirements of *Bryant* and *Bundy*.[44] The police notes could serve as an adequate safeguard against the dangers of suggestive misidentification later in the process, and they were available for use in impeaching the witnesses. Moreover, this is not a case where the agents were subject to the influences identified in *United States v. Bundy, supra*; the interview reports were prepared before the suspects were apprehended, and so the descriptions contained therein could not have been tainted by the agents' view of the defendants.

Finally, the evidence of guilt adduced at trial was overwhelming. The witnesses identified the defendants in the courtroom, as they had earlier when they were shown photo arrays. Gordon and Harrison had also been identified at a line-up. In addition, Pendergrast and Gordon were photographed during the robbery; the photographs were admitted into evidence, and the jury drew its own conclusions on identification. And Gordon had made several incriminating statements to the police. Applying what we have determined to be the appropriate standard for this particular case, we conclude that the convictions must be affirmed.[45]

## VI

We cannot conceive that any valid law enforcement interest will be impaired by retention of the rough notes taken in interviewing witnesses. It may well prove that the Government is correct in its judgment that the notes are almost never discoverable, that they are too cryptic or fragmentary to be producible "statements" under the Jencks Act, and that they are always integrated into the 302 reports with such accuracy and completeness that there is nothing even ar-

guably "favorable" about them to trigger disclosure under *Brady v. Maryland.* But such judgments cannot be made in gross. They must be decided in each individual case, and they must ultimately be decided by a court. Our holding does nothing more than preserve the evidence so that a court can meaningfully play its proper role.

*Affirmed.*

---

**44.** *See* note 1 *supra.*

**45.** We have carefully considered all other issues raised by appellants and find them to be without merit.